UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MARIA QUESADA,

                          Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                       Defendant.

Civil No.    10-cv-1139-JM (POR)

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

**[ECF No. 13]**

**[ECF No. 18]**

## I. INTRODUCTION

On May 26, 2010, Plaintiff Maria Quesada filed a complaint pursuant to section 405(g) of the Social Security Act requesting judicial review of the final decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner" or "Defendant") regarding the denial of Plaintiff's claim for disability insurance benefits.  (ECF No. 1.)

On November 29, 2010, Defendant filed an answer (ECF No. 8), and lodged the Administrative Record (hereinafter "AR").  (ECF No. 9.)  On May 21, 2011, Plaintiff filed a Motion for Summary Judgment.  (ECF No. 13.)  On July 1, 2011, Defendant filed a Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment. (ECF No. 18.)  Plaintiff filed an Opposition on July 16, 2011.  (ECF No. 19.)

The Court finds the motions appropriate for submission on the papers and without oral

argument pursuant to Local Rule 7.1(d)(1). For the reasons set forth herein, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 13) and **GRANTS** Defendant's Cross-Motion for summary judgment (ECF No. 18).

## II. PROCEDURAL BACKGROUND

On February 20, 2007, Plaintiff filed an initial application for Disability Insurance Benefits. (AR 162-64.) Plaintiff alleged a disability beginning on April 1, 2002. (AR 162.) Plaintiff's claim was denied initially on May 25, 2007 (AR 77-80), and upon reconsideration on March 6, 2008 (AR 84-88). Plaintiff filed a timely request for a hearing before an Administrative Law Judge (hereinafter "ALJ") on July 19, 2008. (AR 89-90.) On August 21, 2009, Plaintiff testified at an administrative hearing before an ALJ. (AR 34-74.) She was represented by Stuart Atcheson, Esq. (AR 34.) Dr. Arthur Brovender,[1] a medical expert, and Nellie Katsell, a vocational expert, also testified at the hearing. (AR 34; 57-74.) On September 29, 2009, the ALJ denied Plaintiff benefits. (AR 20-32.) The decision of the SSA became final when the Appeals Council adopted the ALJ's findings by a decision dated March 30, 2010. (AR 1-4.) Thereafter, Plaintiff filed the instant action on May 26, 2010. (ECF No. 1.)

## III. FACTUAL BACKGROUND

Plaintiff was born on July 9, 1959 in Gomez Palacio, Durango, Mexico and moved to the United States at approximately age 28 in 1987. (AR 38; 314.) Plaintiff alleges disability due to multiple back and shoulder injuries. (AR 49-51.) Plaintiff first injured her right arm in a November 2001 work-related accident. (AR 50.) On February 11, 2002, Plaintiff tripped and fell while working as a delivery driver for United Courier Services, further injuring her right shoulder and back. (AR 39, 372-73.) Around the same time, Plaintiff also injured her arm in an automobile accident. (AR 50-51.) As a result of her alleged disability, Plaintiff claims she has been unable to work since February 2002. (AR 50.)

### A.   **Plaintiff's Date Last Insured**

As an initial matter, the Court notes the Administrative Record in this case is voluminous

_____

[1]The Court notes that at various points in the record, Dr. Brovender is referred to as Dr. Burlinger, likely as the result of a transcription error. (AR 27, 29, 57.)

1    and contains medical records dated well after Plaintiff's date last insured of December 31, 2002.  At

2    her hearing, Plaintiff argued her date last insured was December 31, 2007.  (AR 52.)  The ALJ,

3    however, determined Plaintiff was not fully insured after 2002 and therefore found Plaintiff's date

4    last insured was December 31, 2002.  (AR 25.)  Specifically, the ALJ stated:

> The claimant argues that her date last insured is December 31, 2007.  She is
> mistaken.  To be eligible for Disability Insurance Benefits one must not only have
> sufficient quarters of coverage, 20 quarters of coverage in the last 40 quarters, one
> must also be "fully insured" (20 CFR 404.130).  In this case, while the claimant has
> acquired sufficient quarters of coverage to potentially be insured into 2007 using
> the 20/40 test, she was not "fully insured" after December 31, 2002.
>
> To be "fully insured" one must have a quarter coverage for each year after 21 (20
> CFR 404.110(b)(2)).  In this case, the claimant was born on July 9, 1959.  As such,
> she reached age 21 in 1980.  Thus, to be insured in 2003 or thereafter, she would
> require 22 quarters of coverage for 2003 and 23 quarters of coverage for 2004, and
> so on.  In this case, the claimant has only acquired 21 quarters of coverage total.
> Therefore, she is not "fully insured" after 2002, and thus her date last insured is
> December 31, 2002 (Exhibit 1D).

13   (*Id.*)  Plaintiff does not dispute the ALJ's determination of her date last insured in her Motion for

14   Summary Judgment.  (*See* ECF No. 13-1.)  Accordingly, the Court applies the December 31, 2002

15   date of last insured to its analysis in this case.

16        The Court further notes the Administrative Record contains medical records relating to

17   Plaintiff's shoulder and back injuries, as well as various psychiatric disorders, pain disorders,

18   diabetes and bladder dysfunction.  In her application for benefits, Plaintiff claimed she had been

19   unable to work because of a "disabling condition on April 1, 2002."  (AR 162.)  At her hearing,

20   Plaintiff seemed to testify she had been unable to work since 2002 because of her back and shoulder

21   injuries, in combination with incontinence issues.  (AR 50-51.)

22        In his opinion, the ALJ noted Plaintiff was "diagnosed, after her date last insured, with

23   symptoms of anxiety and depression, borderline intellectual functioning, as well as a pain disorder."

24   (AR 26.)  He did not consider these conditions in his analysis, however, because he concluded "there

25   is no reliable medical evidence of psychiatric or cognitive impairment on or before the claimant's

26   date last insured."  (*Id.*)  He further recognized the record reflects cervical complaints and

27   allegations of bladder dysfunction.  (*Id.*)  Again, the ALJ did not address these conditions because he

28   found there was "no medical evidence of these conditions being presen[t] or symptomatic prior to

1   December 31, 2002."[2]  (*Id.*)

2       Plaintiff also does not dispute these findings in her Motion for Summary Judgment.  (*See*

3   ECF No. 13-1.)  In fact, Plaintiff does not even mention her psychiatric disorders, pain disorders,

4   diabetes or bladder dysfunction in the briefing before the Court.  (*Id.*; ECF No. 19.)  Thus, because

5   Plaintiff appears to challenge the ALJ's findings with regard to her back and shoulder injuries only,

6   the Court limits its discussion to the medical evidence of these conditions.

7   **B.**   **Medical Evidence**

8       **1.**    **Treating Physician Evidence**

9           a)    Dr. Jeffrey Bernicker

10      On March 21, 2002, Plaintiff's primary physician referred her to Dr. Bernicker, an

11  orthopedic specialist.  (AR 224.)  Plaintiff complained of pain in her lower back, leg, and right

12  shoulder.  (*Id.*)  She described a constant, sharp pain from her lower back that prevented her from

13  lifting more than 8-10 pounds and claimed she could not sit for more than one hour at a time.  (AR

14  225-26.)  She further reported experiencing intermittent pain and numbness in her left leg and right

15  shoulder.  (AR 226-27.)

16      From the history and records provided, Dr. Bernicker stated it was reasonable to assume

17  Plaintiff's pain was the result of her workplace injury on February 11, 2002.  (AR 231.)  Dr.

18  Bernicker examined her lumbar spine region, reporting tenderness and trace muscle spasm.  (AR

19  229.)  Upon reviewing her February 25, 2002 MRI results, Dr. Bernicker found mild spondylosis of

20  the lower lumbar spine, most pronounced at L4-5.  (AR 228.)  He concluded Plaintiff's back would

21

22          [2] Upon careful review of the record, the Court notes there is some evidence Plaintiff experienced symptoms of

23  bladder dysfunction prior to her date last insured.  At her hearing, Plaintiff testified her bladder had "been hurting" since
    February 2002.  (AR 51, 54.)  In a report dated August 27, 2002, Dr. Mooney stated Plaintiff "has some bladder problems

24  from time to time."  (AR 236.)  In 2008, Dr. William Moseley, a urologist, found it was unclear whether the etiology of
    Plaintiff's symptoms was related to her 2002 work-place injury.  (AR 770.)  Conversely, Plaintiff's treating physician, Dr.

25  Bernicker, claimed Plaintiff reported discomfort with bowel movements, "but not with bladder function."  (AR 226, 1032.)
            Even if the ALJ erred in finding Plaintiff exhibited no symptoms of bladder dysfunction on or before her date last

26  insured, Plaintiff does not raise this issue in her Motion for Summary Judgment.  (*See* ECF No. 13-1.)  Moreover, to the
    extent Plaintiff presented symptoms of bladder dysfunction prior to her date last insured, there is not substantial evidence

27  in the record to support a claim for disability benefits based on Plaintiff's back and shoulder injuries in combination with a
    bladder dysfunction. (AR 26.)  Based thereon, the Court does not address the ALJ's opinion with regard to Plaintiff's alleged

28  bladder dysfunction in this order.

likely respond well to chiropractic and aquatherapy protocols. (AR 230-31.)  As to Plaintiff's

shoulders, Dr. Bernicker found her right shoulder showed a slightly lower range of motion than her

left.  (AR 229-30.)  He concluded Plaintiff demonstrated symptoms consistent with an impingement

disorder and recommended an MRI of the shoulder to rule out a rotator cuff tear.  (AR 231.)

On May 9, 2002, Dr. Bernicker reevaluated Plaintiff's condition.  (AR 1026.)  Plaintiff

reported persistent, constant low back pain extending through both lower extremities into her toes

with diffuse numbness and tingling.  (*Id.*)  She had not responded to the aquatherapy protocol.  Dr.

Bernicker noted Plaintiff appeared to be in "significant distress" and indicated her desire to proceed

with lumbar surgery.  (AR 1027.)  Dr. Bernicker recommended a lumbar discography, an injection

technique used to evaluate back pain in patients who have not responded to less invasive forms of

therapy.  (*Id.*)

Dr. Bernicker evaluated Plaintiff again on July 15, 2002, following her lumbar discography.

(AR 212, 1021.)  The discography results indicated there was significant morphologic changes of

the discs at L4-5 and L5-S1.  (AR 1021.)  Dr. Bernicker "felt that these disc [sic] were pathologic to

a high degree of confidence."  (AR 1021-22.)  Though Dr. Bernicker explained conservative

methods of care could yield a result, Plaintiff reiterated her desire to proceed with surgical lumbar

fusion.  (AR 1022.)  Dr. Bernicker described the procedure in detail and received Plaintiff's

informed consent before authorizing surgery.  (*Id.*)  However, Plaintiff did not undergo surgery at

that time.

b)      Dr. Bruce Van Dam

In January 2003, Plaintiff's attorney referred her to Dr. Bruce Van Dam, an orthopedic spine

specialist.  (AR 956.)  Plaintiff complained of lumbosacral pain associated with bilateral lower

extremity radicular pain.  She also complained of pain in her right shoulder.  (AR 957.)  She stated

she felt most comfortable assuming a fetal position on her right side.   She claimed to have difficulty

sleeping and was unable to sit or stand in the same position for long periods of time.  (*Id.*)

In Dr. Van Dam's opinion, Plaintiff most likely sustained an aggravation of a pre-existing

lumbar condition.  (AR 959.)  He found Plaintiff suffered from instability and stenosis at L4-5 with

discogenic lumbar pain at L5-S1, likely the result of her industrial injury. (*Id.*)  Dr. Van Dam further reported Plaintiff had a partial tear in the supraspinatus tendon of her right shoulder.  (AR 960.)  Based on her condition, Dr. Van Dam concluded Plaintiff was temporarily totally disabled.  (*Id.*)  He found Plaintiff was unlikely to improve absent surgical intervention for the lumbar injury.  (*Id.*)

The record indicates Dr. Van Dam continued to treat Plaintiff for several years and consistently opined that Plaintiff remained temporarily totally disabled.  (*See* AR 379-618; 862-92; 936-60.)  He continued to recommend Plaintiff undergo surgery for both her back and shoulder injuries. (*Id.*)  Dr. Van Dam further maintained that she did not present any signs of "psychiatric illness or malingering."  (AR 348, 352. )  Instead, he claimed other physicians may have misinterpreted her "cultural response to the injuries" as an exaggeration of symptoms.[3]  (AR 352.)  Ultimately, on February 8, 2007, Dr. Van Dam performed Plaintiff's lumbar spine surgery at L4-5 and L5-S1.  (AR 930-31.)

### 2.      Examining Physician Evidence

#### a)      Dr. Vert Mooney

On August 27, 2002, Dr. Vert Mooney evaluated Plaintiff on behalf of the State Compensation Insurance Fund.  (AR 233-34.)  Dr. Mooney reviewed Plaintiff's medical records and work history and conducted a physical examination.  (AR 234-39.)  Plaintiff complained of pain throughout her posterior torso up to the neck, along with pain in the right shoulder and legs.  (AR 238.)  Dr. Mooney diagnosed Plaintiff with an impingement syndrome in her right shoulder, discogenic pain syndrome, and a persistent hip strain.  (AR 239.)

In addition, Dr. Mooney responded to several questions posed by the claims adjuster.  Dr. Mooney stated Plaintiff's current method of treatment was "making no difference" in alleviating her symptoms.  (AR 239.)  While Dr. Mooney generally recommended active progressive exercise programs to treat back injuries, he found that Plaintiff was in too much distress to follow such a

---

[3] In June 2003, Dr. Van Dam referred Plaintiff to Dr. Miguel Alvarez for a psychology consultation.  (AR 284.) Plaintiff complained of severe pain and discomfort during the examination.  (AR 286.)  Plaintiff claimed she hoped surgery would alleviate some of her pain; however, she did not expect that she would be "totally pain free" following surgery.  (*Id.*) Dr. Alvarez diagnosed Plaintiff with anxiety and depression, as well as borderline intellectual functioning (non-industrial). (AR 290.)

program.  (AR 240.)  Thus, Dr. Mooney recommended epidural injections and physical therapy

exercises instead.  (*Id.*)  Plaintiff reiterated her desire to undergo spinal surgery; however, Dr.

Mooney found Plaintiff was "not a good surgical candidate" due to very global pain complaints.

(*Id.*)  He informed Plaintiff she would "absolutely not" improve if she underwent surgery.  (*Id.*)  He

further questioned the sincerity of Plaintiff's complaints of global pain, as she had no back pain

when originally evaluated.  (*Id.*)  However, given her "very severe subjective complaints," Dr.

Mooney concluded Plaintiff could not return to her customary occupation at the time and stated she

"currently appears to be disabled."  (*Id.*)  It does not appear that Dr. Mooney made any

recommendations regarding Plaintiff's subjective complaints of global pain.

                              **b)**    <u>Dr. Richard Ostrup</u>

On October 29, 2002, Plaintiff visited Dr. Richard Ostrup for an initial worker's

compensation neurosurgical evaluation.  (AR 243-47.)  Dr. Ostrup reviewed Plaintiff's medical

records and work history and conducted a physical examination.  (AR 243.)  Plaintiff complained of

pain in her lower back, neck, right shoulder, and left leg.  (AR 244.)  Dr. Ostrup noted Plaintiff

"seemed to be in quite a lot of pain" in her lumbar area during the examination.  (AR 245.)

Dr. Ostrup diagnosed Plaintiff with lumbar sprain as a result of her February 11, 2002

accident.  (AR 246.)  While her discogram suggested disease at L4-5 and L5-S1, Dr. Ostrup found

Plaintiff was a "very poor surgical candidate."  (*Id.*)  In fact, he opined that surgery may worsen

Plaintiff's condition.  (*Id.*)  He noted Plaintiff has "marked exacerbation of her complaints" and

tested "very positive for numerous Waddell's signs," i.e. non-pathologic symptoms.[4]  (*Id.*)

Accordingly, Dr. Ostrup strongly recommended Plaintiff pursue conservative treatment measures.

(*Id.*)

                              **c)**    <u>Dr. Harvey Wieseltier</u>

Dr. Harvey Weiseltier, an orthopedic surgeon and agreed medical evaluator, examined

---

[4] "Waddell's signs" are a group of physical signs that may indicate a non-organic or psychological component to lower back pain.  Waddell's signs are also used to detect malingering or exaggeration in patients complaining of lower back pain. *See* Waddell, Gordon; John McCulloch, Ed Kummel, Robert Venner (March/April 1980), "Nonorganic Physical Signs in Low-Back Pain," *Spine* 5 (2): 117-125.

1    Plaintiff on April 24, 2003.[5]  (AR 249-72.)  Plaintiff complained of pain and numbness in her neck,

2    an occasional sharp pain in her mid back, a constant sharp pain in her lower back that radiated down

3    her legs, and a constant sharp pain in her right shoulder.  (AR 253.)  Based on the physical

4    examination and his review of Plaintiff's medical records, Dr. Weiseltier diagnosed Plaintiff with

5    degenerative disc disease in the cervical spine, cervicobrachial syndrome in the right upper

6    extremity, mild spondylosis at L4-5, disc desiccation and subtle annular bulge at L5-S1,

7    inappropriate examination behavior consistent with somatoform pain disorder, and medial and

8    lateral epicondylitis of the right elbow.[6]  (AR 262.)

9        Dr. Weiseltier found several objective and subjective factors of disability, but he also noted

10   factors of exaggeration.  (AR 265-67.)  Dr. Weiseltier concluded Plaintiff's condition precluded her

11   from heavy work, repetitive or prolonged neck movements, and repetitive work at or above shoulder

12   level.  (AR 267-68.)  Based on Plaintiff's stated job position, Dr. Weiseltier found her condition

13   rendered her unable to perform her usual and customary duties.  (AR 268.)  Dr. Weiseltier further

14   noted there had been varying opinions as to whether Plaintiff should undergo surgery.  (*Id.*)  In his

15   opinion, Plaintiff was not a surgical candidate because signs of "symptom amplification."  (AR 270.)

16   Rather, Dr. Weiseltier concluded Plaintiff would benefit from therapy for her neck and right elbow,

17   as well as injections in her right shoulder.  (AR 271.)

18   **C.    The Hearing**

19        **1.    Plaintiff's Testimony**

20        Plaintiff testified at her Social Security Administration hearing before ALJ John D. Moreen

21   on August 21, 2009.  (AR 36-57.)  Plaintiff stated she was born on July 9, 1959 in Gomez Palacio,

22   Durango, Mexico and moved to the United States at approximately age 28 in 1987.  (AR 38; 314.)

23   Plaintiff completed her education up to the sixth grade in Mexico.  (AR 38.)  She speaks little

24

25        [5] According to the ALJ, an agreed medical evaluator is "a medical source that the parties to the action, the employer
26   and the worker, more specifically their attorneys, agree can provide fair and impartial assessment of the injured worker's
     impairments and limitations."  (AR 28.)

27        [6] At some point, Dr. Wieseltier recommended Plaintiff be referred to a pain management program to address her
28   somatoform pain behavior.  (AR 287.)

English and can read and write only in Spanish.  (AR 38.)  Prior to 2002, Plaintiff worked various jobs in labor, janitorial service and delivery.  (AR 38-48.)  These positions required Plaintiff to lift and carry items ranging from ten to forty pounds in weight.  (AR 40-48.)

Plaintiff described three serious injuries during the hearing.  Plaintiff first injured her right arm and shoulder in a November 2001 work-related accident.  (AR 50.)  On February 11, 2002, Plaintiff tripped and fell while working as a delivery driver for United Courier Services, further injuring her right shoulder and back.  (AR 39, 372-73.)  Around the same time, Plaintiff also injured her arm in an automobile accident.  (AR 50-51.)  Plaintiff testified that she has not worked since that time.[7] (AR 39.)  At the time of the hearing, Plaintiff lived with her mother and a friend; however, she was unable to do any housework.  (AR 39.)  She claimed to receive approximately $650 in monthly income from a Worker's Compensation policy.  (AR 39, 56.)

As a result of her injuries, Plaintiff claimed she was unable to sit or stand for long periods of time.  (AR 48.)  She had surgery on her leg six months prior to the hearing to remedy varicose veins in her leg caused by thrombosis.  (AR 49.)  Plaintiff also claimed to have had surgery on her back, as well as two surgeries on her right arm.  (AR 50.)  Plaintiff testified she has five "bad" discs in her back, which caused severe pain and limited her mobility.  (AR 50-53.)  In addition, Plaintiff claimed to suffer from a loose coccyx, pain in her left leg and right arm, and bladder issues.  (AR 51.)  At the time of the hearing, Plaintiff was using a cane to maintain stability.  (AR 49.)  She reported taking pain medications since 2002.  (AR 55.)  In sum, Plaintiff testified her injuries had rendered her almost entirely bed-ridden.  (AR 56.)

### 2.   The Medical Expert's Testimony

The Social Security Administration's medical expert Dr. Arthur Brovender, a board-certified orthopedic surgeon, testified at the hearing.  (AR 57-66.)  Dr. Brovender stated he had reviewed Plaintiff's case file and her testimony.  (AR 57.)  Dr. Brovender claimed Plaintiff's injuries at the end of 2002 were limited to low back pain and right shoulder pain. (AR 58.)  To the extent Plaintiff

---

[7] Though not addressed at the August 21, 2009 hearing, the record indicates Plaintiff worked in the laundry room at the Loew's Coronado Bay Resort in 2003, where she allegedly suffered another workplace injury.  (AR 275.)

1   complained of other symptoms, Dr. Brovender characterized these complaints as "subjective" and

2   unsupported by the objective findings in the medical record. (AR 58, 61.)  Moreover, Dr.

3   Brovender opined Plaintiff's hearing testimony regarding the severity of her symptoms had been

4   exaggerated. (*Id.*)

5        Thus, according to Dr. Brovender, Plaintiff's injuries did not meet or equal any of the listed

6   impairments from 20 CFR Part 404, Subpart P, Appendix 1. (AR 62.) He concluded that in 2002

7   Plaintiff did not have medical conditions sufficiently severe to interfere with her ability to work.

8   (AR 61.) However, Dr. Brovender found Plaintiff did have exertional limitations that would affect

9   the type of work she could perform. (AR 62.) Specifically, he testified she could lift only ten

10  pounds frequently, twenty pounds occasionally, sit for six to eight hours with breaks, and stand and

11  walk for four hours. (*Id.*) Dr. Brovender further testified she was limited to occasional overhead

12  reaching.[8] (*Id.*)

13       **3.      The Vocational Expert's Testimony**

14       Vocational expert Nelly Katsell also testified at Plaintiff's hearing. (AR 67-74; 133.) She

15  stated she had reviewed Plaintiff's case file and her testimony at the hearing. (AR 67.) Ms. Katsell

16  identified the administrative designation of each of Plaintiff's former jobs, most of which were

17  categorized as "exertion level medium." (AR 67-69.) In establishing Plaintiff's residual functional

18  capacity, the ALJ asked Ms. Katsell a single hypothetical question based on Dr. Brovender's

19  testimony. (AR 69.) He asked whether a hypothetical individual sharing Plaintiff's age, education,

20  and medical limitations could do the type of work that she had performed prior to her 2002 injury.

21  (*Id.*) According to the limitations Dr. Brovender set out in his testimony, Ms. Katsell responded that

22  _____

23       [8]  The record indicates Dr. Brovender testified:

24       She does have limitations.  She's status post fusion so I would say that she can lift 10 pounds frequently,
         20 pounds occasionally.  She should – she could sit for six to eight hours with breaks.  I would say that she
25       could stand and walk four hours.  Combination of either way with breaks.  She can bend, stoop and squat
         occasionally.  She should not go up ropes, ladders and scaffold.  She could go up stairs and ramps
26       occasionally. She can push and pull the weights that I gave.  She should [INAUDIBLE] reaching overhead
         with her shoulder.  She has no limitation of fine fingering. . . .

27  (AR 62.)  Because the ALJ adopted all of Dr. Brovender's testimony as to Plaintiff's limitations, the Court assumes Dr.
28  Brovender testified Plaintiff was limited to occasional overhead reaching. (*See* AR 26.)

the hypothetical individual would not be able to perform any of Plaintiff's former jobs characterized as "exertion level medium." (*Id.*)  However, given the limitations outlined by Dr. Brovender, Ms. Katsell opined Plaintiff could perform jobs that were characterized as unskilled and sedentary.  (AR 70.)  She listed several positions from the DOT, including zipper trimmer, eyedropper assembler, and ink printer, as occupations Plaintiff could perform notwithstanding her physical limitations.[9] (AR 70-72.)

**D.      The ALJ's Findings**

After consideration of all the evidence, the ALJ applied the sequential process for determining disability under the Social Security Act and concluded Plaintiff was not under a disability, as defined by the SSA, on or before December 31, 2002.  (AR 23-32.)

First, the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2002.  (AR 25.)  He found Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2002 through her date last insured of December 31, 2002.  (AR 26.)

Through her date last insured, the ALJ found Plaintiff had the following severe impairments: degenerative joint disease at L3-5 and degenerative disc disease at L5-S1, established by a discogram (Exhibit 1F) and tendinosis of the supraspinatus tendon with evidence of partial thickness tearing and subdeltoid effusion, established by an MRI study (Exhibit 42F.)  (*Id.*)  However, the ALJ found that through the date last insured, Plaintiff did not have a condition that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[10]  (*Id.*)

After careful consideration of the entire record, the ALJ found that through her date last insured, Plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally,

---

[9] Plaintiff's attorney emphasized Ms. Katsell's opinion was based on Dr. Brovender's "liberal" assessment of Plaintiff's limitations.  He noted that he could question the vocational expert whether a hypothetical individual sharing Plaintiff's age, education, and the medical limitations set forth by Dr. Van Dam could perform these occupations, but he stated "it almost speaks for itself."  (AR 74.)

[10] As previously discussed, the ALJ noted Plaintiff was diagnosed with symptoms of anxiety and depression, borderline intellectual functioning and a pain disorder after her date last insured.  (AR 26.)  He further noted the record reflects some cervical complaints and an allegation of bladder dysfunction.  (*Id.*)  However, the ALJ determined there was no medical evidence Plaintiff suffered from these conditions on or before her date last insured.  (*Id.*)

ten pounds frequently, standing and walking four hours in an eight-hour workday, sitting for six hours with ordinary breaks.  He found Plaintiff had no other significant limitations except she was limited to occasional overhead reaching with the right arm.  (*Id.*)

In making this determination, the ALJ recognized there was "a great deal of inconsistency" with respect to the diagnostic evidence and the opinions of the medical sources who examined Plaintiff.  (AR 28.)  The ALJ noted, for example, Plaintiff underwent a discogram on July 11, 2011, which revealed "slight" degeneration at L3-4 with only a small annular tear, "severe" degeneration at L4-5 with fissuring and a disc bulge, and degenerative disc disease at L5-S1 with an annular tear causing epidural leakage.  (*See* AR 212-15.)  Plaintiff also underwent an MRI study of a lumbosacral spine in February 2002.  (*See* AR 1039-45.)  The ALJ observed that "[t]his MRI study failed to observe the 'severe' degenerative and other substantial finding noted in the year-earlier discogram." (AR 28.)

The ALJ also considered the opinions of Plaintiff's treating and examining physicians.  He accepted the assessment of Dr. Brovender, finding the medical expert had "particular expertise in the area of medicine at issue in this case" and his opinions were "well supported by the medical record" as a whole.  (AR 27.)  Moreover, the ALJ noted Dr. Brovender's assessment was consistent with that of Dr. Weiseltier, an impartial orthopedic consultant.  (*Id.*)  In this regard, the ALJ noted Dr. Weiseltier opined that Plaintiff could perform a range of "light work" under Social Security disability regulations.  (*Id.*)  Dr. Weiseltier's examination also "confirmed a number of positive Waddell signs, which he described as 'factors of exaggeration.'" (AR 28.)  Based thereon, the ALJ concluded:

> Considering the inconsistent diagnostic evidence, the mixed and inconsistent clinical findings and the fact that there is ample evidence of Waddell signs, strongly suggesting an element of exaggeration or feigned symptoms, which were confirmed by the "agreed" orthopedic consultant, I cannot say that the medical record, on or before the claimant's date last insured, reliably establishes that her lumbar impairments warrant greater functional limitations, or that Dr. Brovender's assessment is misplaced.  If anything, his assessment appears generous.

(*Id.*)

While the ALJ recognized the opinions of treating physicians are generally entitled to great

weight, he rejected Dr. Bernicker and Dr. Van Dam's opinion that Plaintiff was disabled prior to her date last insured for several reasons.  (AR 29.)  First, the ALJ stated, "it is doubtful that they are the type of treating source contemplated by the regulations, i.e. a long-term, impartial clinician retained without the specter of bias."  (*Id.*)  Here, the ALJ noted both Dr. Bernicker and Dr. Van Dam were "retained for the purpose of furthering the claimant's workers' compensation litigation."  (*Id.*)  As a result, the ALJ questioned their objectivity and impartiality in this case.  Second, the ALJ emphasized that "questions regarding their objectivity was, apparently, a reason why Dr. Weiseltier was retained as an 'agreed' consultant" in Plaintiff's workers' compensation litigation.[11]  (*Id.*)  Third, the ALJ found Dr. Bernicker and Dr. Van Dam's clinical findings were not supported by the medical record as a whole, as Dr. Weiseltier and Dr. Brovender, impartial medical consultants, both "raised concerns regarding exaggeration by the claimant."  (*Id.*)

Similarly, the ALJ discredited Plaintiff's testimony regarding her alleged disabling symptoms.  (AR 30.)  Based on the lack of consistent medical evidence on or before December 31, 2002, the ALJ found there was "not enough medical evidence to make her allegations readily believable."  (*Id.*)  According to the ALJ, Plaintiff's inconsistent statements and actions also undermined her credibility.  (*Id.*)  Again, the ALJ noted there was "substantial medical evidence of exaggerated, if not feigned physical symptoms," as multiple medical sources found positive Waddell signs and other nonphysiological complaints and presentations.  (*Id.*)  Plaintiff's complaints of global pain were also inconsistent with the results of her physical examinations.  (*Id.*)  Moreover, the ALJ found evidence Plaintiff attempted to hide the existence of pre-existing conditions during her workers' compensation litigation.  (*Id.*)  In sum, the ALJ stated he was unable to accept Plaintiff's claims in the absence of consistent and substantial objective medical support.  (*Id.*)

After determining Plaintiff's residual functional capacity, the ALJ found Plaintiff was unable to perform any past relevant work, which was a combination of semi-skilled and unskilled work.[12]

---

[11] This Court does not adopt the speculative reasoning of the ALJ on this issue, but does find the ALJ appropriately stated his reasons for rejecting the opinions of Plaintiff's treating physicians.  *Lester*, 81 F.3d at 830.

[12] The ALJ accepted vocational expert's testimony that an individual with Plaintiff's residual functional capacity would be able to perform unskilled, sedentary work.  (AR 70.)

1   (*Id.*)  The ALJ further found Plaintiff was defined as a younger person and considered illiterate as of

2   her date last insured.  (AR 31.)  Thus, the ALJ determined, Plaintiff's past relevant work experience

3   afforded no transferrable skills.  (*Id.*)

4         Through her date last insured, considering Plaintiff's age, education, work experience and

5   residual functional capacity, the ALJ found there were jobs that existed in significant numbers in the

6   national economy that Plaintiff could have performed.  (AR 31.)  Here, the ALJ relied on

7   hypothetical questions posed during the vocational expert's testimony.  Ms. Katsell testified an

8   individual with Plaintiff's age, education, work experience, and residual functional capacity could

9   perform the requirements of representative occupations, such as zipper trimmer, eye dropper

10   assembler and ink printer.  (*Id.*)  Accordingly, the ALJ determined Plaintiff was "capable of making

11   a successful adjustment to 'other work' that existed in significant numbers in the national economy."

12   (AR 32.)

13         In light of the foregoing analysis, the ALJ concluded Plaintiff was not under a disability, as

14   defined in the Social Security Act, at any time from April 1, 2002, her alleged onset date, through

15   December 31, 2002, her date last insured.  (AR 32.)

## IV. LEGAL STANDARD

17         To qualify for disability benefits under the Social Security Act, applicants must show two

18   things: (1) they suffer from a medically determinable impairment that can be expected to last for a

19   continuous period of twelve months or more, or would result in death; and (2) the impairment

20   renders applicants incapable of performing the work they previously performed or any other

21   substantially gainful employment that exists in the national economy.  *See* 42 U.S.C.A. §§

22   423(d)(1)(A), (2)(A) (West Supp. 2008).  An applicant must meet both requirements to be classified

23   as "disabled."  *Id.*

24         Sections 205(g) and 1631(c)(3) of the Social Security Act allow applicants whose claims

25   have been denied by the SSA to seek judicial review of the Commissioner's final agency decision.

26   42 U.S.C.A. §§ 405(g), 1383(c)(3) (West Supp. 2008).  The Court should affirm the decision unless

27   "it is based upon legal error or is not supported by substantial evidence."  *Bayliss v. Barnhart*, 427

28

F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion[,]" considering the record as a whole. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It means "'more than a mere scintilla but less than a preponderance'" of the evidence. *Bayliss*, 427 F.3d at 1214 n.1 (quoting *Tidwell*, 161 F.3d at 601). "'[T]he court must consider both evidence that supports and the evidence that detracts from the ALJ's conclusion . . . .'" *Frost v. Barnhart*, 314 F.3d 359, 366-67 (9th Cir. 2002) (quoting *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

To determine whether a claimant is disabled, the Social Security regulations use a five-step process outlined in 20 C.F.R. § 404.1520 (2008). If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)). Although the ALJ must assist the applicant in developing a record, the applicant bears the burden of proof during the first four steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999). If the fifth step is reached, however, the burden shifts to the Commissioner. *Id.* at 1098. The steps for evaluating a claim are as follows:

> **Step 1.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.

> **Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.

> **Step 3.** Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "disabled" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.

> **Step 4.** Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then

the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.

Step 5. Is the claimant able to do any other work? If not, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits. If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits.

*Id.* at 1098-99 (footnotes and citations omitted); *see also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001) (giving an abbreviated version of the five steps).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter also may be remanded to the Social Security Administration for further proceedings. *Id.* After a case is remanded and an additional hearing is conducted, the Commissioner may modify or affirm the original findings of fact or the decision. *Id.*

"If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary." *Flaten v. Sec'y Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## V. DISCUSSION

Plaintiff requests the Court reverse the Commissioner's final decision and remand the case to the Social Security Administration for further proceedings because the ALJ committed the following legal errors in rejecting her claim: (1) the ALJ improperly rejected Plaintiff's subjective symptom testimony; (2) the ALJ improperly rejected the medical opinions of Dr. Bernicker and Dr. Van Dam; and (3) the ALJ erroneously concluded Plaintiff had the residual functional capacity to perform other work at step five of the sequential disability analysis. (ECF No. 13 at 6-10.)

Defendant argues the Commissioner's decision, as set forth in the ALJ's written opinion, was supported by substantial evidence and free of reversible error. (ECF No. 18-1 at 6.)

**A.      The ALJ Properly Discredited Plaintiff's Subjective Complaints**

Plaintiff first argues the ALJ committed legal error in rejecting her subjective symptom testimony because he relied on Waddell's signs as an indication Plaintiff exaggerated or feigned her symptoms.  (ECF No. 13-1 at 12.)  She further argues the ALJ's reasons for discrediting Plaintiff's testimony were not supported by substantial evidence.  (*Id.*)

Defendant argues "the ALJ provided a valid basis for finding Plaintiff not fully credible and his reasons are supported by substantial evidence."  (ECF No. 18-1 at 7.)

The ALJ must conduct a two-step analysis in assessing a claimant's subjective testimony.  First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir.1996)).  Once a claimant establishes an underlying impairment, medical findings are not required to support the alleged severity of a claimant's symptoms.  *Bunnell v. Sullivan*, 947 F.2d 342, 345 (9th Cir. 1991).  If the ALJ finds the claimant's testimony about the severity of her pain and impairments unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude he did not arbitrarily discredit the claimant's testimony.  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  In weighing a claimant's credibility, an ALJ may consider several factors, including ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid.  *Tommasetti*, 533 F.3d at 1039.  "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'"  *Id.* (quoting *Thomas*, 278 F.3d at 959).

In the instant case, the Court finds the ALJ's adverse credibility determination regarding Plaintiff's alleged disabling symptoms was supported by substantial evidence.  First, the ALJ found the inconsistent medical evidence, including the conflicting results from the 2002 MRI and 2001 discogram, undermined Plaintiff's subjective complaints.  (AR 28-30; *see also* AR 212-15, 1039-45.)  Though lack of objective evidence supporting Plaintiff's symptoms cannot be the sole basis for discounting symptom testimony, the ALJ properly considered it as one factor in his credibility

1  analysis. *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

2         Second, the ALJ found "substantial medical evidence of exaggerated, if not feigned physical

3  symptoms." (AR 30.) Contrary to Plaintiff's assertion, evidence of symptom exaggeration is a valid

4  basis for discounting a claimant's credibility. *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir.

5  2003); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). Here, multiple examining

6  physicians, including Drs. Mooney, Ostrup, Weiseltier and Brovender, found positive Waddell signs

7  and other evidence of malingering. (*Id.*; *see also* AR 58-61, 238, 245-46, 265-67.) To the extent

8  Plaintiff's treating physicians, Dr. Bernicker and Dr. Van Dam, found otherwise, the ALJ provided

9  clear and convincing reasons for discounting their opinions. (AR 29.)

10        Third, the ALJ relied on evidence of Plaintiff's apparent attempt to hide pre-existing

11 conditions during her workers' compensation litigation. (AR 30.) While receiving treatment for her

12 February 2002 injury, Plaintiff did not disclose that she underwent a discogram in July 2001to

13 evaluate ongoing back and lower extremity pain. (*Id.*; *see also* AR 212-41.) Plaintiff seems to argue

14 the July 2001 discogram was dated incorrectly. (ECF No. 13-1 at 12.) Even assuming the discogram

15 was performed in 2002, the Court finds the ALJ's reasoning was supported by other evidence in the

16 record. Plaintiff's hearing testimony demonstrates she may have also attempted to hide a November

17 2001 work-related injury to her shoulder during her workers' compensation litigation. (*See* AR 50.)

18        Based on the foregoing, the Court finds the ALJ provided sufficiently specific analysis to

19 conclude he did not arbitrarily discredit Plaintiff's subjective testimony. *Thomas*, 278 F.3d at 958.

20 Accordingly, the Court hereby **DENIES** Plaintiff's motion for summary judgment (ECF No. 13) and

21 **GRANTS** Defendant's cross motion for summary judgment (ECF No. 18) as to this claim.

22 **B.    The ALJ Properly Discredited the Opinions of Plaintiff's Treating Physicians**

23        Plaintiff further argues the ALJ committed legal error in discounting the opinions of Drs.

24 Bernicker and Van Dam, Plaintiff's treating physicians. (ECF No. 13-1 at 7-8.) She contends the

25 ALJ failed to provide valid reasons for finding Drs. Bernicker and Van Dam unreliable. (*Id.*)

26        Defendant claims the ALJ reasonably discredited Drs. Bernicker and Van Dam's

27 unsupported and contradicted medical opinions. (ECF No. 18-1 at 9.)

28        The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those

1   who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

2   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

3   physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "It is not necessary, or even

4   practical, to draw a bright line distinguishing a treating physician from a non-treating physician.

5   Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration

6   of the treatment relationship and the frequency and nature of the contact." *Le v. Astrue*, 529 F.3d

7   1200, 1201 (9th Cir. 2008) (quoting *Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir.2003)). In

8   general, a physician qualifies as a treating source if the claimant sees him with a frequency

9   consistent with accepted medical practice for the type of treatment and/or evaluation required for the

10   medical condition. *Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003).

11   Opinions of treating physicians may be rejected only under certain circumstances. *See

12   Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). "[W]here the treating

13   doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and

14   convincing' reasons." *Lester*, 81 F.3d at 830 (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th

15   Cir. 1991)); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). "Even if the treating

16   doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion

17   without providing 'specific and legitimate reasons' supported by substantial evidence in the record."

18   *Lester*, 81 F.3d at 830 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

19   Here, the ALJ found Dr. Bernicker and Dr. Van Dam's clinical findings could not be

20   replicated by other physicians. (AR 29.) For instance, while multiple examining physicians,

21   including Drs. Mooney, Ostrup, Weiseltier and Brovender, found positive Waddell signs and other

22   evidence of exaggeration, Dr. Van Dam maintained that she did not present any signs of "psychiatric

23   illness or malingering." (AR 348, 352. ) Likewise, Dr. Bernicker did not find any signs of

24   malingering during his exams. (AR 224-31, 1026-27.) Dr. Bernicker and Dr. Van Dam also opined

25   Plaintiff was disabled prior to her date last insured. (*Id.*; *see also* AR 1020-38, 1050-57.)

26   Conversely, Dr. Brovender and Dr. Weiseltier found Plaintiff capable of performing "light work"

27   under Social Security disability regulations. (AR 27; *see also* AR 62-66, 248-73.)

28   Even if Dr. Bernicker and Dr. Van Dam's opinions were contradicted by those of other

physicians, Plaintiff argues the ALJ failed to reject their findings for specific and legitimate reasons. (ECF No. 13-1 at 10-11.)  In his written opinion, the ALJ explained he discounted the opinions of Drs. Bernicker and Van Dam because their opinions lacked "basic indicia of reliability."  (AR 29-30.)  The record supports the ALJ's finding that "these doctors were retained for the purpose of furthering the claimant's workers' compensation litigation, as evidenced by the fact that their reports were not directed to the patient, as one would expect within a normal treatment relationship, but to her workers' compensation attorney and insurance adjusters."  (AR 29; *see also* 224-32, 342-60, 379-517, 952-61, 1021-38.)  The record further supports the ALJ's suspicion of "improper medical advocacy."  (AR 28.)  For example, in a letter to Plaintiff's workers' compensation attorney, Dr. Van Dam stated:

> In my opinion, this unfortunate woman has been caught in the vortex of a system that has lost the focus on why it exists, to fairly compensate and care for injured workers.  She has been suffering from injuries to her right shoulder and lumbar spine for over three years.  She was long ago cleared psychologically, which was an issue raised by Dr. Harvey Wieseltier.  She is not going to improve without surgery, which was recommended months ago. . . .

(AR 451.)  It is not unreasonable to assume treating physicians would withhold their opinions on the workers' compensation system in a normal treatment relationship.  Finally, the ALJ stated the parties would not have retained Dr. Weiseltier, an "agreed" medical consultant, unless they questioned her treating physicians' objectivity.[13]  (AR 29.)

Based thereon, the Court finds the ALJ provided "'specific and legitimate reasons' supported by substantial evidence in the record" in discrediting the opinions of Plaintiff's treating physicians, Drs. Bernicker and Van Dam.  *Lester*, 81 F.3d at 830.  Accordingly, the Court hereby **DENIES** Plaintiff's motion for summary judgment (ECF No. 13) and **GRANTS** Defendant's cross motion for summary judgment (ECF No. 18) as to this claim.

**C.     The ALJ Properly Relied on Vocational Expert Testimony**

Plaintiff contends the ALJ's findings that Plaintiff could transition to other work was based on legal error and not supported by substantial evidence.  (ECF No. 13-1 at 9.)  It appears Plaintiff

---

[13] As previously stated, this Court does not adopt the speculative reasoning of the ALJ on this issue, but does find the ALJ appropriately stated his reasons for rejecting the opinions of Plaintiff's treating physicians.  *Lester*, 81 F.3d at 830.

objects to the vocational expert's testimony that a person limited to occasional overhead reaching could perform the occupations of zipper trimmer, eye dropper assembler and ink printer.  Plaintiff seems to argue these occupations require constant reaching, which she is incapable of performing. (*Id*; ECF No. 19 at 2.)

Defendant argues the ALJ properly relied on the vocational expert's testimony as all of the jobs identified in his opinion do not exceed Plaintiff's limitations.  (ECF No. 18-1 at 14.)

Once a claimant has established that he or she suffers from a severe impairment that prevents claimant from returning to former employment, the claimant has made a prima facie showing of disability.  At this point–step five– the burden shifts to the Social Security Administration to show claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience.  *See* 20 C.F.R. § 404.1560(b)(3).  Social Security Ruling ("SSR") 00–4p governs the use of occupational evidence.  *Massachi v. Astrue*, 486 F.3d 1149, 1150 (9th Cir. 2006); *see* SSR 00–4p, available at 2000 WL 1898704 at \*2.  According to SSR 00-4p, at step five of the sequential evaluation, an ALJ is to "rely primarily on the DOT ... for information about the requirements of work in the national economy."  *Id.*  An ALJ may also call upon a vocational expert to provide occupational evidence through testimony at a disability benefits hearing.  *Id.*; *see also Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). As part of a disability determination, an ALJ has an "affirmative responsibility" to address any conflicts between the vocational expert's testimony and information contained in the DOT as to the requirements of a job.  *Massachi*, 486 F.3d at 1152-53.

In this case, Plaintiff argues the vocational expert's testimony conflicted with information contained in the DOT, yet the ALJ failed to elicit testimony on this conflict.[14]  (ECF No. 13-1 at 9.) At Plaintiff's hearing, the medical expert testified Plaintiff's shoulder injury prevented her from overhead reaching.  (AR 62.)  Ms. Katsell, the vocational expert, opined Plaintiff could perform the

---

[14] The Court notes the ALJ asked Ms. Katsell only one hypothetical question based on Dr. Brovender's testimony. (AR 69.)  He did not ask Ms. Katsell hypothetical questions based on Plaintiff's subjective symptom testimony, nor did he ask questions based on the testimony of her treating physicians.  Plaintiff does not seem to raise this issue in her Motion for Summary Judgment. (ECF No. 13-1.)  Nevertheless, the Court finds the ALJ's limited questioning was not objectively unreasonable because the ALJ discredited Plaintiff's subjective symptom testimony and disregarded the testimony of Plaintiff's treating physicians, Drs. Van Dam and Bernicker.

job of zipper trimmer, eyedropper assembler and ink printer, notwithstanding the limitations described by the medical expert.  (AR 70.) Although the ALJ did not refer to the DOT during the hearing, he questioned the vocational expert on job limitations as described in the DOT.   The ALJ also asked Ms. Katsell whether her testimony was in conformance with the DOT and she responded "yes."  (AR 70.)

There is substantial evidence in the record indicating Plaintiff is limited to occasional *overhead* reaching, with no such limitation on frequent or constant reaching generally.  (AR 26.) Plaintiff fails to provide any support for the proposition that a job requiring frequent or constant reaching would necessarily require constant overhead reaching as well.  Rather, other cases have reviewed the same provisions of the DOT and found jobs requiring either "frequent" or "constant" reaching do not require reaching or handling at or above the shoulder-level. *See Rodriguez v. Astrue*, 2008 WL 2561961, at *2 (C.D. Cal. 2008).  The vocational expert's testimony that Plaintiff could perform these positions did not conflict with the DOT job descriptions.  Based thereon, the Court finds the ALJ did not commit legal error in adopting the testimony of the vocational expert. Accordingly, the Court hereby **DENIES** Plaintiff's motion for summary judgment (ECF No. 13) and **GRANTS** Defendant's cross motion for summary judgment (ECF No. 18) as to this claim.

### V. CONCLUSION

After a thorough review of the record in this matter and based on the foregoing analysis, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Cross Motion for Summary Judgment be **GRANTED**.

DATED:  September 26, 2011

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:          The Honorable Louisa S Porter
             All parties